[Civ. No. 1215. Fourth Appellate District.—April 5, 1933.]

JASON E. BARTON et al., Respondents, v. JAMES HENRY PIERCE et al., Appellants.

W. R. Bailey and Adolph Feierbach for Appellants.

H. B. McClure and Farnsworth, Burke & Maddox for Respondents.

CAMPBELL, J., pro tem.—This action was commenced by respondents to establish the ownership of all the parties to

this action in and to a certain ditch and water rights, which ditch, known herein as the ''Lovelace'' or ''Brundage'' ditch, leads out of the North Fork of the Kaweah River in Tulare County, California. By their complaint respondents claim a three-quarter ownership or interest in said ditch and water rights. From a judgment in favor of respondents appellants have taken this appeal. The cause was tried by the court without a jury and written findings were filed.

In their briefs appellants set out two grounds for reversal: (1) The action should have been dismissed for want of prosecution; (2) The evidence establishes a prior water right vested in appellants and fails to support the findings of the trial court.

1. The following facts are shown by the record: The complaint was filed August 9, 1924. On October 1, 1924, appellants herein duly served and filed their answer and cross-complaint and plaintiffs served and filed their answer to said cross-complaint January 26, 1925. Thereafter the action was tried on the eighth and ninth days of July, 1925, before the late Honorable W. B. Wallace, Judge of the superior court. On the twenty-eighth day of August, 1925, the court filed its written opinion and ordered that plaintiffs recover judgment and that they prepare findings of fact and conclusions of law. On May 2, 1926, the Honorable W. B. Wallace died. No findings of fact, conclusions of law or judgment were ever signed, filed or entered in said action prior to the death of said judge on May 2, 1926. No further steps were taken in the action until the fourth day of September, 1930, on which date plaintiffs served and filed a memorandum of motion to set the cause for trial. This motion came on for hearing on September 15, 1930. On the fifteenth day of September, 1930, prior to the hearing of said motion, the defendants duly served and filed in said cause defendants' notice of motion to dismiss the action. The motion to dismiss was finally heard on October 6, 1930, and the court made its order denying the same. Appellants' motion is based on section 583 of the Code of Civil Procedure, which provides that ''The court may in its discretion dismiss any action for want of prosecution on motion of the defendant and after due notice to the plaintiff, whenever plaintiff has failed for two years after answer is filed

to bring such action to trial. Any action heretofore or hereafter commenced shall be dismissed by the court in which the same shall have been commenced or to which it may be transferred on motion of the defendant, after due notice to plaintiff or by the court upon its own motion, unless such action is brought to trial within five years after the defendant has filed his answer, except where the parties have stipulated in writing that the time may be extended. . . . ''

The court, in *Kruly* v. *Superior Court,* 122 Cal. App. 458 [10 Pac. (2d) 178], says: ''The petitioners erroneously interpret numerous decisions requiring the dismissal of actions under the foregoing provisions which had been set for trial but had not been 'brought to trial', as determinative of the question here presented (citing cases) . . . it was said ' ''The trial of an action and the setting of it for trial are quite distinct things, and an action is certainly not brought to trial until the trial is commenced.'' ' It is not denied that, as distinguished from those cases, the instant case was in fact brought to trial. It is conceded that the trial was commenced, and for aught that may be made to appear by the record before us, was concluded with the exception of final submission. The section invoked by the petitioners does not require a dismissal notwithstanding such action is brought to trial within the time therein specified, nor during suspension of proceedings after the same shall have been brought to trial. Its language is clear in this respect, and is conclusive.''

This case unquestionably was brought to trial within one year after the answer was filed. The death of Judge Wallace on May 2, 1926, set the order for judgment which he had made at naught in a legal sense. Within five years, to wit, on December 3, 1930, the action was again brought to trial and judgment entered. Thus the action was ''brought to trial'', within the meaning of that term as defined in the case of *Kruly* v. *Superior Court, supra,* within five years after the death of Judge Wallace. It was entirely within the discretion of the trial court to either grant or deny the appellants' motion to dismiss. Under the facts as outlined in this case it cannot be said that there was an abuse of discretion on the part of the trial court in denying the motion.

2. Appellants do not direct our attention to any particular finding as not supported by the evidence. Hence we have examined all of the findings and read the entire record so that we might be better able to understand the subject matter of this appeal.

It then becomes necessary to make a rather full statement of the history of the lands and water rights involved.

In 1869, T. A. Lovelace, predecessor in interest of appellants, while in possession of appellants' land constructed a ditch leading out of the North Fork of the Kaweah River at a point above said lands and extending on to the same. This was a small ditch with a headgate at the river made of loose rocks. In 1873 he obtained a patent to the land. In 1875, T. A. Lovelace sold the land to John W. Lovelace, who in turn sold it to T. J. Brundage the same year. In 1875, D. R. Deming and J. A. Durham were partners and had made an application to purchase all of section 23. They, too, then dug a ditch from the end of the ditch in the Lovelace land to and on the northeast quarter of section 23, lands now owned by Jason E. Barton and the Thorns. They went to the head of the Lovelace ditch, built a wooden headgate and enlarged the ditch from the head down through the Lovelace land to the ditch they had first dug. Deming stayed a few months and then sold his interest to J. A. Durham. In 1878, T. J. Brundage sold the Lovelace 160 acres of land in sections 13 and 14, which included the Pierce land, to J. A. Durham. In December, 1878, Durham granted to L. A. Rockwell the right to run water through what he called the "Brundage ditch" sufficient for irrigation purposes, on section 23.

In January, 1880, Durham granted to James Barton the land now owned by appellants Pierce and the land now owned by respondent Ben Hardin; also a "ditch of water now flowing on said land". James Barton acquired other lands, until on October 2, 1886, he held the record title to all the lands of respondents except that of the Thorns, and he also owned the land now belonging to appellants Pierce. Prior to this time, in 1885, L. A. Rockwell granted the ditch and ditch rights he acquired from Durham to James W. Griffes. Marion E. Griffes acquired the Thorn land in 1887. In 1888, Marion E. Griffes conveyed it to J. W. Griffes. By various mesne conveyances this land and its appurtenances

passed to the present owners. In November, 1880, James Barton acquired by quitclaim deed 7.71 acres of land in the northwest quarter of section 13, to which patent was obtained in 1882. This was included in the lands later acquired by appellants. Thus, in 1886, James Barton held title to the Pierce lands and to the lands of Enos D. and Jason E. Barton. In October, 1886, James Barton conveyed the north half of the northeast quarter of section 23 to his son, O. D. Barton, who granted it to the present owner, Jason E. Barton, in November, 1898. In December, 1894, James Barton conveyed the Pierce land to his son, Milton M. Barton, who owned it until 1910, when he granted it to appellants Pierce. On April 10, 1909, James Barton granted to his son Enos D. Barton the land now owned by respondent Ben Hardin. Respondents Thorn acquired their land in 1917. The lands of the parties to this action were irrigated from the "Brundage ditch" and everything was harmonious until the year 1924. The record discloses that that year the water was very low in the Kaweah River and appellants Pierce undertook to take all of the water, to the exclusion of the respondents. This action followed. Thus we have the history of the ditch and the parcels of land involved as is disclosed by the record on appeal.

The evidence is sufficient to establish the fact that by the year 1875, T. A. Lovelace, appellants' predecessor in interest, had established a prior water right by appropriation. However, we are confronted with the question of whether or not this priority between the respective parcels of land was abandoned. ■ It is well settled that the question of abandonment is to be determined by the conduct of the parties, and is a question of fact for the trial court. (1 Wiel on Water Rights, 3d ed., sec. 567, p. 604; 26 Cal. Jur., p. 104; *Richard* v. *Hupp*, 4 Cal. Unrep. 824 [37 Pac. 920].)

The trial court found: " . . . it is true that for more than 40 years prior to . . . the month of August, 1924, the said defendants and cross-complainants and their predecessors in interest, agreed to and practiced a division of the waters of said ditch so that three-fourths of the waters flowing therein flowed down to the lands of the plaintiffs hereinbefore particularly described, and one-fourth of said waters was used upon the said lands of the defendants and cross-complainants; and during all of said time, the plaintiffs and

cross-defendants and their predecessors in interest performed three-fourths of all labor and bore and paid three-fourths of all expense in and about the care and maintenance of said Brundage Ditch, and the defendants and cross-complainants and their predecessors in interest performed one-fourth of all such labor and bore and paid one-fourth of all such expense.'' Excerpts from the testimony of Jason E. Barton shows the status of the respective owners of the ditch and water rights: ''Q. Now, Mr. Barton, when did you go up there, yourself, to that land or any of those lands that are indicated in that map? A. In 1880. . . . Q. Now at that time when you went there, how far did this ditch extend? A. It extended to the same place that it does, it ended then where it ends today. . . . Q. What did Rockwell have on the land, outside of the house? A. Why, he had the tillable land below the ditch pastured and into alfalfa, and he had corn fields and orchards, and so forth. We were cultivating it. Q. Did he have—what kind of an orchard did he have on there—on that land? A. He had quite an apple orchard, and oh, a variety of trees. Q. What did he raise in the way of other crops? A. Well, he had a big alfalfa field and corn field and grain and just a general farm. Q. Did he irrigate it from the time he went there; did he irrigate the orchard and those other crops every year? A. Yes. Q. From what source did he irrigate them? A. From the Brundage ditch. Q. And that is also known as the Barton Ditch—the ditch here in question? A. Yes. Q. Did he irrigate from any other source? A. No. Q. Yes, all right; and now the next piece that is shown on the map above the Thorn land was or is marked the J. E. Barton land, that is your land? A. Yes. Q. What was the state of affairs on that piece at the time you went up there? A. Practically all of the level land that could be irrigated was being irrigated at that time. Q. State approximately the acreage that was being irrigated on what is known as the J. E. Barton land at that time? A. Well, I would think that fifteen acres, anyhow. Q. Well, that J. E. Barton was —when you went there—in whose possession was it? A. It was in Mr. Rockwell's possession. Q. He was farming it; now the next piece north of it is marked Enos Barton; was any land being irrigated on that when you went up there? A. Yes, sir. . . . Q. Now in 1882 what was done with this

ditch? A. Why Mr. Rockwell and my father enlarged it in 1882 from Mr. Rockwell's north line across the 80 acres that my father had got from Mr. Rockwell on up through the Lovelace place to the head. Q. Now by the Lovelace place—you mean the place your father had bought up there? A. Yes from Durham. Q. And did they enlarge it clear up to the head of the ditch? A. Yes, I worked on it. Q. Now, who worked on that ditch? A. My father and my brother Lan, or Milton Barton, and myself. Q. Did Mr. Rockwell do any work upon it? A. No, we did all of the work and Mr. Rockwell paid for his share of it. . . . Q. Well, now who turned out and cleaned it? A. Who turned it out? Q. Who did the work? A. Well, at the head of the ditch there would be four men start in at the head of the ditch, and they would clean down through father's place, and then two men would drop out and Orlando and Mr. Rockwell would clean through Orlando's portion and down to Mr. Rockwell's line. Q. After Orlando got his deed to the 80 acres from your father there was apparently Orlando, Rockwell and your father interested in the waters of the ditch or used it? A. Yes, sir. Q. Now, it was only those three men who were interested in that water who did the work of maintaining the ditch? A. Well, Mr. Rockwell and my father, Orlando and my father. Q. Yes, all right. Now what portion did Mr. Rockwell do? A. One-fourth. Q. What portion of it did Orlando do? A. One-fourth. Q. What portion of it did your father do? A. One-half. Q. Now it appears that after that, in the year 1894, I think, your father conveyed to Milton Barton—your brother—was it not? A. Yes, sir. Q. He conveyed to Milton Barton the land now known as the Pierce land? A. Yes. . . . Q. From the time that Milton Barton took the ownership of the Pierce land, how was the work of maintaining the ditch divided between the different persons there? A. Well, Mont did one-fourth of the work, and my father and Enos did one-fourth of the work and my brother Orlando did one-fourth of the work—or I believe I had bought out my brother Orlando at that time and I did one-fourth of the work, and Mr. Rockwell did one-fourth of the work. . . . Q. And about when was that that Mr. Pierce took over the land that Milton Barton had owned? A. Well, I have forgotten; it was 15 or 20 years. Mr. Bailey: 1910 is the deed

in evidence. Mr. Burke: 1910. In the years following 1910, Mr. Barton, after Mr. Pierce took over that land how was the .work of maintaining the ditch divided between the parties? A. Just the same as it was before. Q. Well, what part, if any, did Mr. Pierce do? A. He did one-fourth of the work. . . . Q. Now up to the year 1924, what was the practice or custom in regard to dividing the waters of the ditch between the different parcels of land there? A. Each one used as near as they could one-fourth of the water. Q. What I am trying to get at is during those years up to 1924, did you rotate the full head or divide the full head among yourselves? A. We generally divided it. Q. How much did each one take out of the quantity flowing in the ditch? A. We practically used one-fourth of the water apiece. Q. From the time Mr. Pierce went there? A. Yes. Q. Now what happened in 1924? A. Mr. Pierce took all of the water. Q. About when in 1924? A. Well, along in July sometime. Q. What kind of a season—so far as run off of water in the north fork of the Kaweah River—was the year 1924? A. It was the lowest that I ever saw it. Q. Along about July Mr. Pierce took the entire head of water in the ditch? A. Yes, sir.''

█ The testimony quoted shows clearly the whole course of conduct of the parties and their predecessors in interest in maintaining the ditch and in using and dividing the water for their respective parcels of land from 1880 to 1924. From this testimony the trial court took the view that all priority, if any, that ever existed between the respective parcels of land had long since been abandoned, and impliedly so found. The evidence is conflicting, but from the testimony there is ample evidence to sustain the findings and judgment of the trial court.

Appellants complain that some of the rulings of the trial court on the admission of evidence are erroneous. The errors, if any, were harmless and in nowise prejudiced the rights of the appellants.

Let the judgment be affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 28, 1933, and an

application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 1, 1933.